## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Oct 08 2015, 8:41 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Cynthia Phillips Smith
Law Office of Cynthia P. Smith
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: M.V. & J.V., *(Minor Children)*

And

M.H. *(Mother)*

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

October 8, 2015

Court of Appeals Case No. 79A02-1503-JT-187

Appeal from the Tippecanoe Superior Court

The Honorable Thomas K. Milligan, Senior Judge

Trial Court Cause Nos. 79D03-1410-JT-44 79D03-1410-JT-45

**Robb, Judge.**

# Case Summary and Issue

M.H. ("Mother") appeals a juvenile court's order terminating her parental rights to her children M.V. and J.V (the "Children"). Mother raises several issues for our review, which we consolidate and restate as whether the juvenile court's termination order is supported by clear and convincing evidence. Concluding the juvenile court's order is not clearly erroneous, we affirm.

# Facts and Procedural History

On June 20, 2013, the Lafayette Police Department ("LPD") received a request for a child welfare check at the residence of Mother and T.V. ("Father").[1] Upon arrival, LPD entered the home where two-year-old M.V. was present. LPD recognized an odor of burnt marijuana and discovered drug paraphernalia. LPD immediately contacted the Department of Child Services ("DCS"), as conditions in the home were deplorable and Mother was being arrested—for almost the 25th time—on an outstanding warrant. DCS arrived and discovered:

> The living room was cluttered with toys and a small pillow mattress that [M.V.] had been sleeping on. The kitchen floor was filthy with large spots where dirt on the floor was swept and not picked up. The counters were completely covered with dishes that contained old food on them. There were numerous pots and

---

[1] Father does not appeal the juvenile court's decision to terminate his parental rights. The record indicates "Father essentially has voluntarily terminated his parental rights by knowingly quitting services." Appendix of Appellant at 23. References to Father are for the sole purpose of providing clarity.

pans on the stove covered with old food. The sink could not be accessible due to the amount of dishes spilling out of it. The little bit of counter space that was visible had stains, dirt, and what appeared to be ashes. There was almost no food in the refrigerator. The first bedroom had carpet that was filthy and trash scattered throughout the room. There was a cup in the room that appeared to have ashes in it. There were two reptile aquariums that housed a tarantula. These were very close to the edge of a dresser and had no lids from preventing the large spider to escape. The one bathroom in the residence appeared dirty. There were diapers and trash piled almost to the top of the counter to the left of the toilet. There was fecal matter that was sitting in the toilet and had built up over the past 5 days. The floors and walls were filthy throughout the house. [M.V.'s] clothes appeared to be filthy . . . .

Documentary Exhibit 1 at 2. At the time, Mother was seven months pregnant with J.V.

[3] In early July, DCS removed M.V. from Mother's custody and placed M.V. in her paternal grandmother's care. Thereafter, DCS initiated Child in Need of Services ("CHINS") proceedings. On July 15, Mother entered a guilty plea to aiding a burglary, a Class B felony, and was sentenced to six years in the Indiana Department of Correction ("DOC"), suspended to probation. On July 31, M.V. was adjudicated a CHINS based on Mother's recent arrest, the presence of illegal substances in the home, the condition of the home, and parents' inability to provide a safe home environment. The juvenile court ordered M.V. remain in her paternal grandmother's custody.

[4] Mother and Father subsequently moved in with the paternal grandmother, thus reuniting with M.V. On August 14, the court ordered Mother and Father participate in reunification services. Specifically, Mother, who has a history of substance abuse and bipolar disorder, was to submit to mental health and substance use assessments, and participate in case management therapy. She never participated in any assessment and cancelled some therapy sessions. Following the court order, Mother gave birth to J.V. J.V. was not immediately removed from Mother's and Father's care because they were residing in the home of the Children's paternal grandmother, had obtained employment, and were actively participating in services on M.V.'s case. On September 30, however, DCS filed a CHINS petition due to concerns regarding J.V.'s weight.

[5] On October 8, Mother was arrested for violating the terms of her probation and was released on home detention. On November 8, however, Mother was again arrested for violating the terms of her probation and home detention when alcohol was discovered in her residence. After the arrest, DCS made a surprise visit to the residence. DCS discovered "spice"[2] and drug paraphernalia under a couch cushion. Additionally, both Mother and J.V., who was two months old at the time, tested positive for opiates. Because the paternal grandmother was moving to another state, the juvenile court ordered the Children be placed with a paternal great aunt and uncle. The trial court revoked Mother's probation

---

[2] "Spice" refers to certain synthetic forms of marijuana. *See Elvers v. State*, 22 N.E.3d 824, 828 (Ind. Ct. App. 2014).

and Mother was sent to DOC, where she currently remains. On December 11, the juvenile court adjudicated J.V. a CHINS.

[6]     On October 6, 2014, DCS filed a petition for termination of Mother's parental rights. In December, the juvenile court conducted parent-child termination proceedings. DCS' case manager testified Mother's parental rights should be terminated:

> [DCS:] Why is it then that you articulate the position that we will be unlikely to remedy the problems that led to removal from [Mother]?
> [Case Manager:] Well [Mother] is currently incarcerated and will be for the next two years and she's incarcerated due to things that she did at the beginning of the case.
> [DCS:] And so – and you had an opportunity to look backward at her history before the case began?
> [Case Manager:] Yes.
> [DCS:] And did [Mother], well tell us what – and I don't think we need details just generally about [Mother's] criminal history before our case began?
> [Case Manager:] She has a pretty extensive criminal history of runaways and theft.
> [DCS:] Is it fair to say that if [Mother] gets out of the Department of Corrections [sic] and does well, finds a job, keeps a job, finds a house, keeps a house, stays out of legal trouble that it will really be the first time in her life that she done so?
> [Case Manager:] Yes.

Transcript at 33-34. Moreover, because M.V. displays symptoms of attention deficit hyperactivity disorder ("ADHD") and bipolar disorder, and J.V. suffers from respiratory issues, DCS expressed concerns about Mother's ability to care for her Children's special needs. DCS recommended the Children be adopted

by their paternal aunt and uncle because the Children were thriving in their placement with those relatives. The court-appointed special advocate ("CASA") also recommended termination of Mother's parental rights, noting Mother could not "provide a safe, supportive environment for [M.V.] and [J.V.]." *Id.* at 82.

[7] On February 27, 2015, the juvenile court issued an order terminating Mother's and Father's parental rights. In doing so, the court noted, in relevant part:

> Mother has been continuously incarcerated since October 10, 2013. Her projected outdate, at the time of termination hearing was August 16, 2016. She has not been available to participate in services since incarceration. Prior to incarceration, she only participated in services sporadically. She did not follow any of the assessments she had with treatment or other services and appeared to be unable or unwilling to cooperate with and follow the directives of the court and the Department of Child Services. Mother has not been able to maintain her own home, maintain employment, or provide stability or security for the [C]hildren. She has shown no satisfactory substance abuse treatment or mental health treatment. She has not demonstrated any understanding of reasonable expectations for child appropriate behavior and development as children grow and develop.
> * * *
> The parents have not demonstrated a willingness to make lasting changes from past behaviors or maintain stability in order to care and provide adequately for the [C]hildren. Continuation of the parent-child relationships poses a threat to the well-being of the [C]hildren. The [C]hildren need parents with whom the [C]hildren can form a permanent and lasting bond to provide for the [C]hildren's emotional and psychological as well as physical well-being. The [C]hildren's well-being would be threatened by keeping the [C]hildren in parent-child relationships with parents

whose own choices and actions have made them unable to meet the needs of the [C]hildren. DCS has a satisfactory plan of adoption for the care and treatment of the [C]hildren following termination of parental rights. The [C]hildren can be adopted and an appropriate permanent home has been found for the [C]hildren and that is to be adopted by the paternal great aunt and uncle with whom they have been in foster placement.

App. of Appellant at 22-23. Mother now appeals.

# Discussion and Decision

## I. Standard of Review

"[T]he involuntary termination of parental rights is an extreme measure that is designed to be used as a last resort when all other reasonable efforts have failed." *In re C.G.*, 954 N.E.2d 910, 916 (Ind. 2011). Indiana Code section 31-35-2-4(b)(2) provides, in pertinent part, what must be proven in order to terminate parental rights:

> (2) The petition must allege:
> * * *
> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> * * *
> (C) that termination is in the best interests of the child . . . .

The State must prove each element by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009). "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival." *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005) (citation and internal quotation marks omitted). Rather, it is sufficient to show by clear and convincing evidence that "the child's emotional and physical development are threatened" by parents' custody. *Id.* (citation omitted). "[I]f the court finds that the allegations in a petition . . . are true, the court shall terminate the parent-child relationship." Ind. Code § 31-35-2-8(a). "When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility." *In re G.Y.*, 904 N.E.2d at 1260. Rather, we consider only the evidence and reasonable inferences most favorable to the juvenile court's judgment. *Id.*

[9] Because the juvenile court entered findings of fact and conclusions of law in terminating Mother's parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We set aside a juvenile court's judgment only if it is clearly erroneous. *Id.* A judgment is "clearly erroneous if the findings do not support the . . . conclusions or the conclusions do not support the judgment." *Bester*, 839 N.E.2d at 147.

# II. Termination Order

Mothers contends the juvenile court's termination order was clearly erroneous in several respects. She claims DCS failed to prove the conditions resulting in the Children's removal will not be remedied; DCS failed to prove she posed a threat to the Children's well-being; and DCS failed to prove termination was in the Children's best interest.

First, Mother argues DCS failed to prove there was a reasonable probability the conditions leading to the Children's removal from her care will not be remedied. "In determining whether the conditions that led to a child's removal will not be remedied, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing and take into consideration evidence of changed conditions." *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). The court may properly consider the services the State offered to the parent, and the parent's response to such services. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Further, DCS need not rule out all possibilities of change, but only establish there is a reasonable probability the parent's behavior will not change. *In re A.B.*, 924 N.E.2d at 670.

In terminating Mother's parental rights, the court stated "Mother's history of criminal convictions, drug use, and mental health issues along with her unwillingness or inability to address those issues leads the court to find that the aforesaid conditions and circumstances will not be remedied." App. of Appellant at 23. Mother contends she has been drug free for the entirety of her

incarceration, has completed classes in the DOC, and has been unable to complete mental health and substance use assessments due to her incarceration. We, however, must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *In re A.B.*, 924 N.E.2d at 670 (citation omitted).

[13] Following the birth of M.V. in September 2010, Mother violated the terms of her probation stemming from a conviction for possession of marijuana, and entered a guilty plea on multiple charges, including public intoxication, unlawful possession or use of a legend drug or precursor, and aiding a burglary. After the initiation of M.V.'s CHINS proceedings in July 2013 and the birth of J.V. the following month, Mother again was arrested for violating the terms of her probation by missing required appointments; she was released on home detention. Mother then violated the terms of her home detention by having alcohol in her residence and was arrested; DCS later discovered "spice" and drug paraphernalia in the home during a surprise visit. Moreover, Mother admitted to using heroin twice after the birth of J.V., and J.V. tested positive for opiates.

[14] Notwithstanding Mother's criminal history, it is worth noting DCS did not immediately remove J.V. from Mother's and Father's custody. Nearly two months after the birth of J.V., however, DCS removed J.V. for the same reasons M.V. was removed: substance abuse and conditions of the home. Therefore, Mother was aware of the conditions she needed to remedy and had an opportunity to do so. She did not complete a mental health or substance use

assessment prior to her incarceration; instead, she opted to abuse drugs and violate the terms of her probation. Mother's unwillingness to take appropriate action—not her incarceration—evidences a "substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014); *see also In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999) ("A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change."), *trans. denied*, *cert. denied*, 534 U.S. 1161 (2002). The juvenile court did not clearly err in concluding the evidence shows a reasonable probability the conditions resulting in the Children's removal will not be remedied.

[15] Mother also contends the juvenile court erred in finding that continuation of the parent-child relationship posed a threat to the Children's well-being. However, Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires only one element in that subsection be true to terminate parental rights. *See In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). Because we conclude the evidence is sufficient to show a reasonable probability the conditions resulting in the Children's removal will not be remedied, we need not determine whether the court erred in concluding continuation of the parent-child relationship posed a threat to the Children's well-being.

[16] Finally, Mother argues DCS failed to prove termination was in the Children's best interest. Specifically, she contends the Children "have a relationship with

[her], and it would not be in their best interests to have their relationship with their biological parent severed." Brief of Appellant at 14.

[17] "In determining what is in the best interests of the child, the trial court is required to look beyond the factors identified by the DCS and look to the totality of the evidence." *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009).

> The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Recommendations of the case manager and court-appointed advocate, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests.

*In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014) (citations omitted), *trans. denied*.

[18] First, and as noted above, there is sufficient evidence that the conditions resulting in the Children's removal will not be remedied, and both the CASA and the DCS case manager recommended termination. Second, the DCS case manager testified the Children have adapted well to their paternal aunt and uncle and recommended those relatives adopt the Children:

> [DCS:] And can you share with the Court please your observations about how they're doing with these relatives?
> [Case Manager:] The children are extremely bonded to them. The relatives provide a very structured home for the kids. It's safe.
> [DCS:] [H]ave you walked into a house yet where you immediately could feel these are foster parents; this is a foster home. This is not a normal family. Have you had that

experience?

[Case Manager:]  Yes.

[DCS:]  When you walk into this family's home do you get any of that sense that this is a temporary or substitute home for these children or does it just feel like this is their home?

[Case Manager:]  Absolutely not, I mean they're like a family when we go.

[DCS:]  All right, I mean everything about them functions like any other family with two young children?

[Case Manager:]  Yes.

* * *

[DCS:]  So if the Court were to grant the termination of parental rights, what is the department's plan for the long term care and treatment of the [C]hildren?

[Case Manager:]  The plan is for [M.V.] and [J.V.] to be adopted by the paternal great-aunt and uncle.

Tr. at 35-36, 41.  The CASA agreed, noting the Children's placement with relatives provided a safe home environment and assisted M.V. with her behavioral issues:

[DCS:]  And how is the – are you in agreement with that plan?

[CASA:]  Yes.

[DCS:]  And can you describe to the Judge the relationship with these children and their relative placement?

[CASA:]  They have formed a very strong bond with the entire family . . . aunt and uncle are incredibility [sic] supportive; they have provided much needed medical assistance to [M.V.] and [J.V.], much needed structure, discipline, proper nutrition.  It is absolutely a family not just a foster home.

[DCS:]  And have you seen – what type of progress, if any, have you seen in [M.V.]'s emotional behavior while she's been with relative placement?

[CASA:]  Well, since November I have observed that at the beginning when [M.V.] was asked to do something as simple as

sit at a table and finish your meal from start to finish, she couldn't do it at that beginning; massive temper tantrums, wouldn't go to bed, had no bedtime set until she moved in with [aunt and uncle] and now I seen, although she still has issues, I mean she's got a long road ahead of her, I see structure, discipline; she's less tired, there are fewer temper tantrums. She will ask for things, not interrupt people; she just won't take things. Overall a happier kid.

*Id.* at 82-83. Finally, we note the Children need a stable environment, especially in light of M.V.'s behavioral issues and J.V.'s respiratory issues; the paternal relatives have shown they can provide the necessary support.

[19] Accordingly, DCS presented clear and convincing evidence from which the juvenile court could conclude that termination of Mother's parental rights was in the best interests of the Children.

# Conclusion

[20] We reverse a termination of parental rights only upon a showing of clear error. There is no such error here. DCS established by clear and convincing evidence the requisite elements to support the termination of Mother's parental rights. The judgment of the juvenile court terminating Mother's parental rights is affirmed.

[21] Affirmed.

Vaidik, C.J., and Pyle, J., concur.